UNITED STATES of America, for and on behalf of William SMITH, et al., Plaintiffs,

v.

John HOBBS, et al., Defendants.

No. Civ.A. 2:97–1211.

United States District Court, S.D. West Virginia, Charleston Division.

April 16, 1999.

Kelly R. Curry and Michael L. Keller, Assistant U.S. Attorneys, Rebecca A. Betts, U.S. Attorney, Charleston, WV, for plaintiffs.

Patrick L. Cottrell and John R. Mitchell, Mitchell & Murray, Charleston, WV, for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Plaintiff's motion for a permanent injunction. The motion is ripe for review. After careful consideration, the Court **GRANTS** in part and **DENIES** in part the motion.

### I. FACTUAL BACKGROUND

William and Gloria Smith, an African–American couple, purchased a parcel of land located at 135 Simmons Creek Road outside of Belle, Kanawha County, West Virginia. The Smiths planned to use the land as the site for a double-wide mobile home, their intended dwelling. At the time, John and Mary Hobbs, two of the Defendants, lived in a home on land adja-

cent to the Smiths' parcel. Their son and his wife, Defendants John Wayne and Brenda Hobbs, now live there.

At a jury trial held on February 2 and 3, 1999, the jury found Defendants, singly and in combination, discriminated against the Smiths by seeking to interfere with, intimidate or otherwise impede their choice of residence on account of the Smiths' race.

Specifically, the evidence showed the Hobbs sought to prevent the Smiths from moving the mobile home onto their lot by falsely claiming ownership of an adjoining parcel that was needed for access. Second, in March 1996, after the Smiths obtained legal title to the needed additional parcel, the Hobbs confronted them in a verbally abusive manner that included the use of racial epithets and racially charged statements. Among other racially derogatory statements, Defendant John Hobbs told William Smith that no one was afraid of his "black ass;" Defendant John Wayne Hobbs said, with an open pocket knife in his hand, "We should have hung you niggers when we had the chance." John Wayne Hobbs also warned, "I will blow up your whole family." After this, Norma Hobbs Priddy, John Hobbs' daughter, told Mr. Smith that he should "run" because her father was going to get a gun.

When the Smiths were not deterred in their choice of residence, the Hobbs erected a racially crude display of black ducks hanging from a cross. The cross, manufactured of sewer pipes, was decorated with red Christmas lights. John Hobbs acknowledged he took two rubber ducks and spray-painted them black,[1] although he denied knowledge of who hung them from the cross by shoestrings tied around the ducks' necks. Similarly, John Hobbs posted signs warning people not to be caught on his property after dark and

---

1. John Hobbs testified he painted the rubber ducks black because he hated the color yellow and the color black was his favorite. He said the ducks were an Easter joke on his wife because he had never understood using bunnies and chicks as symbols of Easter.

hung a flag advocating, "Kill them all and let God sort them out."

Moreover, John Hobbs walked the boundary of his land with a gun in his holster clearly displayed when Mrs. Smith was at home alone with her children. Finally, John Hobbs communicated public threats, statements he was collecting poisonous snakes to place on the Smiths' property, to third persons who passed the information to the Smiths.

The jury found for the Smiths and awarded $10,000 in damages. The Court entered a Partial Judgment Order, embodying the jury's verdict and finding such order to be final. The Order was not appealed. The Court now resolves the remaining relief sought by Plaintiff.

Plaintiff now seeks a permanent injunction prohibiting the Hobbs from engaging in (1) unsolicited contact with the Smiths, (2) harassing or intimidating contact with trial witnesses, (3) displaying weapons on their property adjacent to the Smiths', especially patrolling their property with displayed weapons, (4) erecting signs or displays on property that does not belong to them, and (5) erecting signs or displays that are racially offensive or threatening. Plaintiff also seeks the injunction to require the Hobbs to (1) remove any signs on property not owned by them, and (2) raze the existing fence constructed of scrap lumber between the Hobbs' and the Smiths' properties. Plaintiff does not object to a professionally constructed fence of even proportion and suitable fence materials, provided the fence does not interfere with the Smiths' ability to observe traffic on Simmons Creek Road, when entering or exiting the Smiths' property.

Defendants oppose the motion, arguing the only discriminatory acts proved at trial occurred in 1996 when John and Mary Hobbs lived on Simmons Creek. They contend no further discriminatory acts have occurred since 1996, and certainly not since John Wayne and Brenda Hobbs replaced John and Mary Hobbs on the property. Further, they maintain the violations were not flagrant and are not likely to recur, arguing the acts were either not directed toward the Smiths or that the acts ended and have not recurred. They contend there is no evidence the Hobbs have attempted to, or will in the future, contact the Smiths or any witnesses other than by invitation. Finally, they argue the fence was erected after their house was vandalized, was not directed toward the Smiths, and is not an eyesore.

## II. DISCUSSION

■ As stated by our Court of Appeals, "The primary purpose of an injunction in Fair Housing Act cases is to prevent future violations of the Act and to eliminate any possible recurrence of a discriminatory housing practice." *United States v. Warwick Mobile Homes Estates,* 558 F.2d 194, 197 (4th Cir.1977). Before granting an injunction, there must be "some cognizable danger of recurrent violations." *Id.* In determining whether injunctive relief is appropriate, or in fashioning the injunction itself, the Court may consider a number of factors, including "the bona fide intention of the party found guilty of discrimination to presently comply with the law, the effective discontinuance of the discriminatory practice(s) in question, and, in some cases, the character of past violations." *Id.*

■ After hearing the evidence at trial, and observing Defendants' repeated attempts to give innocent explanations for blatantly discriminatory acts, including patently unbelievable explanations with internal inconsistencies,[2] the Court has no trouble concluding there is a cognizable danger of recurrent violations. Having

---

**2.** Defendant John Hobbs stated he left the ducks hanging by shoestrings around their necks for the paint to dry and did not know how they got hung on the cross. Later in his testimony, however, he said he remembered someone in a dump truck stopped in the road and told him some boys who were drunk had hung those ducks from his cross.

observed the Hobbs' testimony and demeanor, and particularly considering the Hobbs' persistently stated belief they did nothing discriminatory, the Court believes there is little apparent intention shown to comply with the law. Although many of the discriminatory acts took place in 1996, the recurrent attempts to prevent the Smiths from moving onto the property or to intimidate the Smiths into leaving their property have not been "effectively discontin[ued]," *Warwick*, 558 F.2d at 197, but merely slowed by fear of legal retribution. Moreover, the particular acts included the use of fear and intimidation, through the posting of black ducks hung by their necks from a cross and signs warning others were not safe outside after dark. At an altercation in March 1996, the Hobbs also attacked the Smiths with harsh, vulgar words of threatened harm to the Smiths and all African–Americans. Finally, John Hobbs gave the Smiths persistent reminders of veiled harm, by patrolling his property's boundary while displaying a gun. Considering all these factors, the Court concludes an injunction is appropriate to prevent further violations of the Fair Housing Act.

Although mindful of the need to "fashion relief designed to cure 'the lingering vestiges of discrimination,'" the Court recognizes it may impose "'no restriction greater than necessary to protect the plaintiff from the injury of which he complains.'" *Id.* (citations omitted). The Court believes Plaintiff's proposed injunction, on the whole, is well-suited to prevent further violations of the Act, while being narrowed to avoid placing too great a restriction on Defendants.

The Court modifies Plaintiff's request for injunctive relief in three ways. First, it is unduly restrictive and insufficiently linked to preventing further violations of the Act to prohibit Defendants from erecting "signs or displays on property not rightfully in their possession." Pls.' Mot. at 2. Rather, it will be sufficient to prohibit Defendants from erecting any signs or displays "of a racially offensive or threatening nature." *Id.* at 2–3. Similarly, instead of preventing Defendants from making any contact whatsoever with Plaintiffs unless invited to do so, it is sufficient to prohibit Defendants from contacting the Smiths with the purpose of harassing, intimidating, threatening, or otherwise discriminating against them on the basis of their race. Finally, there is only problematic evidence that Defendants constructed their fence for the purpose of harassing, intimidating or otherwise discriminating against the Smiths. The fence, however, does block the Smiths' view of highway traffic, thus interfering with their right to safe egress to the public road. Accordingly, the Court modifies the proposed injunction to require Defendants to remove the front two panels of the fence nearest the highway.

## III. CONCLUSION

Accordingly, the Court (1) **GRANTS** in part and **DENIES** in part Plaintiff's motion for a permanent injunction and (2) **ORDERS** Defendants permanently enjoined as follows:

1. Defendants shall refrain from making contact with William Craig Smith, Gloria Smith, Courtney Smith, William G. Smith or Cierra Smith with the purpose of harassing, intimidating, threatening, or otherwise discriminating against them on the basis of their race;

2. Defendants shall refrain from contacting any witnesses who testified at the trial of this matter to harass, intimidate or otherwise threaten those witnesses who appeared in the underlying proceedings. Those witnesses were Nancy Campbell, Michelle Pauley, Ruby Derrix, Larry Samples, Jerry Holt, Norma Hobbs Priddy, Judy Seabolt Moore, Patty Sue Kay, Susan Dyer and Darrell Dyer.

3. Defendants shall refrain from displaying any weapons on property located at 138 Simmons Creek Road,

Belle, West Virginia, including but not limited to knives and firearms of any sort; and under no circumstances shall Defendants "patrol" or "walk" their property while carrying such a weapon on their person whether or not sheathed, holstered or concealed;

4. Defendants shall not erect displays or signs of a racially offensive or threatening nature, or with the purpose of harassing, intimidating, threatening, or otherwise discriminating against the Smiths on the basis of their race; and

5. Regarding the fence erected between the parcel of property at 135 Simmons Creek Road (the Smith property) and 138 Simmons Creek Road (the Hobbs property), Defendants shall remove the front two panels nearest the highway.

The Court **ORDERS** this case **DISMISSED** and **STRICKEN** from the docket.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.